IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PETER WILLIS,                          )
                                       )
                 Plaintiff,            )
                                       )
v.                                     )        Civil Action No. 3:13cv278-HEH
                                       )
KENNETH BLEVINS, JR., *et al.*,        )
                                       )
                 Defendants.           )

MEMORANDUM OPINION
(Granting in Part and Denying in Part Defendants' Motion to Dismiss)

This is a civil rights action against a number of law enforcement and public

officials based in Westmoreland County and the Town of Colonial Beach. It is presently

before the Court on Defendants Edward O'Shea III ("O'Shea") and Jonathan Franklin's

("Franklin") Motion to Dismiss (ECF No. 10), filed on June 3, 2013. For the reasons set

forth herein, Defendants' Motion to Dismiss will be granted in part and denied in part.[1]

I. BACKGROUND

The claims against O'Shea and Franklin stem from Plaintiff Peter Willis's

("Willis") arrest on March 15, 2011, for attempted first-degree murder, aggravated

malicious wounding, and abduction. (Compl. ¶¶ 59–60, ECF No. 27.) Willis was

incarcerated for 349 days in the Northern Neck Regional Jail before a jury acquitted him

on May 8, 2012. (*Id.* at ¶¶ 89, 90.) Willis's arrest and charges were based on statements

---

[1] Willis consents to dismissal of the claim against Franklin—Willis's Fifth Cause of
Action. Thus, the Court will grant the Motion to Dismiss with respect to the claims against
Franklin with no further discussion. (Pl.'s Mem. Opp. Defs.' Mot. Dismiss 14, ECF No. 14.)

1

made by Defendant Carey Groendal ("Carey") that Willis had attempted to murder her on March 8, 2011. (*Id.* at ¶ 57.)

Defendant Kenneth Blevins, Jr. ("Lt. Blevins"), a lieutenant with the Colonial Beach Police Department, investigated Carey's allegations, and O'Shea, an Assistant Commonwealth's Attorney for Westmoreland County, reviewed the evidence and prepared the case for trial. Willis claims that O'Shea engaged in numerous acts of misconduct throughout the proceedings. He asserts that O'Shea and Lt. Blevins conspired to: (1) provide Carey with access to Willis's voluntary, recorded interview about the events that occurred on March 8, 2011; (2) orchestrate a sham interview with Carey and her estranged husband, Defendant Todd William Groendal ("Todd"), on March 30, 2011, to solicit fabricated statements; (3) re-characterize Carey's admittedly self-inflicted injuries as ligature marks; (4) fabricate photographs of the master bathroom in the townhome where the alleged events took place; and (5) use the fabricated evidence to mislead the Court during the pretrial hearings and at trial. (*Id.* at ¶¶ 118.A.–F.)

As a result of the events discussed above, Willis filed suit in this Court on May 2, 2013. The Complaint asserts one cause of action against O'Shea—that O'Shea conspired with Lt. Blevins to fabricate evidence against him, in violation of 42 U.S.C. 1985(2). O'Shea moves this Court to dismiss the claim against him pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or

the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. ANALYSIS

O'Shea offers three arguments in support of dismissal. First, he claims that he enjoys absolute immunity under *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), for all of the alleged misconduct. Second, O'Shea asserts that Willis has failed to allege sufficient facts to state a claim for conspiracy. Third, he argues that qualified immunity affords protection for any misconduct not shielded by absolute immunity. Willis contends that neither absolute immunity nor qualified immunity shields the purported misconduct and

that he has alleged facts sufficient to state a claim for conspiracy to fabricate evidence. As will be discussed in detail below, it would appear that at least one of the alleged acts of misconduct may fall outside the zone of prosecutorial action protected by absolute immunity. When considered in the light most favorable to Willis, the allegations, though lacking in many respects, are sufficient in part to state a claim and to partially defeat O'Shea's assertions of absolute and qualified immunity at this stage of the proceedings.

## A. Absolute Immunity

The absolute immunity enjoyed by prosecutors subject to actions under 42 U.S.C. §§ 1983 and 1985 derives from the common-law immunity afforded to judges and extended to prosecutors acting in a quasi-judicial capacity. *See Imbler*, 424 U.S. at 420; *see also Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring). In developing the contours of absolute immunity for § 1983 and § 1985 actions, the Court has weighed the same public policy considerations underlying the common-law rule of prosecutorial immunity. The two principal concerns were (1) "that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties" and (2) "that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 423; *see Kalina*, 522 U.S. at 125 (emphasizing that "the interest in enabling [the prosecutor] to exercise independent judgment when 'deciding which suits to bring and in conducting them in court'" is the bedrock policy justification for the grant of absolute immunity) (citation omitted). The Court concluded that absolute immunity for the prosecutor's performance of functions

4

"intimately associated with the judicial phase of the criminal process" represented the best means for preventing these undesirable outcomes. *Imbler*, 424 U.S. at 430.

The Court fully appreciated that the extension of absolute immunity to prosecutors for § 1983 and § 1985 violations would yield significant injustices for some defendants, stating that absolute immunity "leave[s] the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Imbler*, 424 U.S. at 427. However, the Court reasoned, "the alternative of qualifying a prosecutor's immunity would disserve the broader public interest." *Id.* A grant of only qualified immunity "would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 127–28. Stressing the difficulty of balancing the competing interests of the individual defendant and the broader public, the Court invoked the wisdom of Judge Learned Hand:

> "As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

*Id.* at 128 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

In addition to the policy considerations supporting the prosecutor's ability to exercise independent judgment, the Court "emphasize[d] that the [civil] immunity of the prosecutor . . . does not leave the public powerless to deter misconduct or to punish that which occurs." *Imbler*, 424 U.S. at 428–29. First, criminal laws offer a viable means of deterring willful misconduct by prosecutors. Second, prosecutors are subject to

professional discipline by their peers for such misconduct. Thus, there are alternative

checks to the imposition of civil liability that compel prosecutors to be "mindful of the

constitutional rights of persons accused of crime[s]." *Id.*

As stated above, a prosecutor is entitled to absolute immunity for the performance

of functions "intimately associated with the judicial phase of the criminal process." *Id.* at

430. To ascertain whether a specific action falls within the ambit of protected conduct,

courts employ a "functional approach," distinguishing acts of advocacy from

administrative duties and investigative tasks unrelated "to an advocate's preparation for

the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons,* 509

U.S. 259, 273 (1993) (citation omitted). *See Goldstein v. Moatz,* 364 F.3d 205, 213 (4th

Cir. 2004); *Carter v. Burch,* 34 F.3d 257, 261–63 (4th Cir. 1994). Absolute immunity

only protects those "acts undertaken by a prosecutor in preparing for the initiation of

judicial proceedings or for trial, and which occur in the course of his role as an advocate

for the State." *Buckley,* 509 U.S. at 273.

*Imbler* acknowledged that "[d]rawing a proper line between these functions may

present difficult questions" and declined to establish hard boundaries. 424 U.S. at 431 n.

33. *See Ehrlich v. Giuliani,* 910 F.2d 1220, 1223 (4th Cir. 1990) ("The line between a

prosecutor's advocacy and investigative duties is not clearly defined."). Subsequent

decisions by the Supreme Court and the Fourth Circuit, though, have provided some

guidance in applying the rule announced in *Imbler.* Accordingly, this Court will draw on

the reasoning and the examples provided in *Imbler* and its progeny in determining

whether Willis's allegations are barred by absolute immunity.

Willis's conspiracy claim against O'Shea comprises several distinct accusations: (1) providing Carey access to Willis's interview or its content on March 30, 2011; (2) orchestrating a sham interview to solicit fabricated statements from Carey and Todd on March 30, 2011; (3) agreeing to characterize Carey's admittedly self-inflicted injuries as ligature marks; (4) fabricating photographs of the scene of the alleged crime; and (5) using the fabricated evidence to mislead the Court during the pretrial hearings and at trial. (Compl. ¶¶ 118.A.–F.)  Despite the range of alleged activities encompassed by the purported conspiracy, Willis contends that none of O'Shea's actions are covered by absolute immunity because his participation in the conspiracy constituted a pre-indictment, investigatory act.[2] (Pl.'s Mem. Opp. Defs.' Mot. Dismiss 8.)  According to Willis, absolute immunity affords no protection for the alleged misconduct because it occurred before a grand jury had determined the existence of probable cause. (*Id.* at 7–8.)  Alternatively, he argues that under *Buckley*, a probable cause determination does not guarantee absolute immunity where the prosecutor continues to perform investigate tasks. (*Id.* at 8.)

*Imbler* and its descendant cases do not bear out Willis's assertion that all acts undertaken by the prosecutor prior to a probable cause determination by a grand jury fall outside the protection of absolute immunity. *Imbler* broadly established the doctrine's initial contours as applying only to acts "intimately associated with the judicial phase of

---

[2] In his Opposition to O'Shea's Motion to Dismiss, Willis seeks to recast his claim against O'Shea and Lt. Blevins as solely for their alleged *conspiracy to fabricate evidence prior to the preliminary hearing* on May 4, 2011. (Pl.'s Mem. Opp. Defs.' Mot. Dismiss 5.)  This Court is not bound by Willis's labels and makes its own determination as to the appropriate characterization of the allegations.

the criminal process." 424 U.S. at 430. The Court held that "in initiating a prosecution

and in presenting the State's case, the prosecutor is immune from a civil suit for damages

under § 1983." 424 U.S. at 431. *Imbler* further "recognize[d] that the duties of the

prosecutor in his role as advocate for the State involve actions preliminary to the

initiation of a prosecution and actions apart from the courtroom." *Id.* at 431 n. 33. Thus,

the Court acknowledged that acts in preparation for and comprising the initiation of a

prosecution, not just post-indictment conduct, fall within the bounds of covered conduct.

    *Buckley* reaffirmed the Court's commitment to "the principle that acts undertaken

by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and

which occur in the course of his role as an advocate for the State, are entitled to the

protections of absolute immunity." 509 U.S. at 273. Willis's argument may have drawn

inspiration from the Court's observation that "[a] prosecutor neither is, nor should

consider himself to be, an advocate before he has probable cause to have anyone

arrested." *Id.* at 274; *see Goldstein*, 364 F.3d at 214 (citing *Buckley*, 509 U.S. at 274).

However, *Buckley* implicitly rejected any requirement that a court or a grand jury's

finding of probable cause is a prerequisite for absolute immunity.[3] *See* 509 U.S. at 273

---

[3] *Goldstein* reinforces this conclusion in its discussion of *Imbler* and *Buckley*:

The protection afforded by absolute immunity extends to activities "intimately
associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at
430, because those activities, like judicial decisionmaking, involve the substantial
exercise of discretion. Once a prosecutor possesses probable cause, he must
decide whether to prosecute, which charges to initiate, what trial strategy to
pursue, and a multitude of other important issues that require him to exercise
discretion. In a pre-probable-cause investigation, on the other hand, a prosecutor
exercises no more discretion than a police officer and thus should enjoy no more
protection than qualified immunity. *See Buckley*, 509 U.S. at 273 . . . .

(finding "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation . . . *before a grand jury after a decision to seek an indictment has been made*" constitute acts of preparation for the initiation of judicial proceedings) (emphasis added).

*Imbler* and *Buckley*, thus, extend absolute immunity to acts of advocacy undertaken in preparation for judicial proceedings or for trial. A probable cause determination by a grand jury or a court is neither necessary nor sufficient, standing alone, to trigger the protection of absolute immunity. First, contrary to Willis's position, advocative acts of preparation undertaken prior to an indictment fall within the sphere of conduct protected by absolute immunity. *See Buckley*, 509 U.S. 273–74. Second, post-indictment acts are not categorically protected by absolute immunity. *See id.* at 274 n. 5 ("[A] determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . , a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity."). Thus, the question remaining before this Court is whether the alleged acts of misconduct are advocative or investigative in character.

As noted above, distinguishing between investigative and advocative acts is a difficult enterprise, and the Supreme Court and the Fourth Circuit have given little concrete guidance on the matter. However, in developing the framework outlined above,

---

*Goldstein*, 364 F.3d at 214–15. The Fourth Circuit clearly did not interpret *Buckley* to require a court or grand jury to find probable cause. Rather, the prosecutor need only have probable cause to initiate charges.

the courts have considered several specific examples analogous to the acts of misconduct alleged in the immediate case. A review of the relevant case law and its application to Willis's allegations follows.

*Imbler* concerned a prosecutor who allegedly knowingly used false testimony at trial and deliberately suppressed exculpatory evidence. Though the holding focused on the initiation of a prosecution and the presentation of the State's case at trial, the Court recognized "that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n. 33. *Imbler* further specified that "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Id.* Lastly, and of particular relevance to the present case, the Court noted that "an effort to control the presentation of [a] witness'[s] testimony" constitutes an act of advocacy. *Id.* at 431 n. 32.

In *Burns v. Reed*, 500 U.S. 478 (1991), the prosecutor allegedly provided legal advice to the police about their investigation prior to any arrest and then omitted material facts about the defendant's confession during a post-arrest probable cause hearing. Because the appearance before the judge directly implicated the prosecutor's role in the judicial process, the Court held that the prosecutor enjoyed absolute immunity for the presentation of misleading evidence in support of the motion for a search warrant. *Id.* at 491–93. However, the Court determined that only qualified immunity was appropriate for the act of giving legal advice to the police, as it would be "incongruous to allow

prosecutors to be absolutely immune for giving advice to the police, but to allow police officers only qualified immunity for following the advice." *Id.* at 495.

The Court in *Buckley* tackled the issue of whether absolute immunity applied to the fabrication of evidence during a preliminary investigation. 509 U.S. at 272. The sheriff and the prosecutors allegedly conspired to obtain false evidence by shopping for an expert to link the defendant's boot to a bootprint recovered at the crime scene.[4] *Id.* The Court's analysis started with an affirmation of "the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Id.* at 273. "Those acts," the Court reasoned, "must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Id.*

In applying the functional approach, the Court revisited the concern raised in *Burns* that police and prosecutors be treated consistently. The Court first noted the distinction "between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial . . . and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be

---

[4] After three experts were unable to match the defendant's boot to the bootprint at the crime scene in the early stages of a murder investigation, the prosecutors found an expert willing to state that the print matched the defendant's boot. *Buckley*, 509 U.S. at 262–63. The prosecutors then empaneled a special grand jury for the sole purpose of continuing to investigate the murder. *Id.* at 263–64. Following an 8-month investigation, the grand jury still was unable to return an indictment. *Id.* at 264. A few months later, with no new evidence, the prosecutors obtained an indictment. *Id.*

arrested . . . ." *Id.* "After *Burns*," the Court concluded, "it would be anomalous . . . to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested." *Id.* at 275. Thus, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer," he is entitled only to qualified immunity. *Id.* at 273. Focusing on the early stage of the investigation in which the prosecutors allegedly fabricated evidence against the defendant in *Buckley*, the Court added that "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Id.* at 276.

*Kalina* distinguished between direct testimony given by a prosecutor and presentation of evidence by a prosecutor. Seeking an arrest warrant, the prosecutor filed two unsworn pleadings—a criminal information against the defendant and a motion for an arrest warrant—and one sworn pleading—a certification for determination of probable cause. *Kalina*, 522 U.S. at 121. The certification summarized the evidence supporting the charges, and the prosecutor personally vouched for the truth of the evidence. *Id.* However, the certification contained two inaccuracies, and the arrest warrant issued. *Id.* In making the certification, the Court concluded, the prosecutor "performed an act that any competent witness might have performed." *Id.* at 129–30.

The Court rejected the argument that the certification was part of "a presentation that, viewed as a whole, was the work of an advocate and was integral to the initiation of

12

the prosecution." *Id.* at 130. "That characterization [was] appropriate for [the] drafting of the certification, [the] determination that the evidence was sufficiently strong to justify a probable-cause finding, [the] decision to file charges, and [the] presentation of the information and the motion to the court." *Id.* The Court noted that "[e]ach of those matters involved the exercise of professional judgment; indeed, even the selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause required the exercise of the judgment of the advocate." *Id.* The critical distinction for the Court was that the exercise of that "judgment could not affect the truth or falsity of the factual statements themselves." *Id.* "Testifying about facts," however, "is the function of the witness, not of the lawyer." *Id.* Accordingly, the Court declined to extend the protection of absolute immunity to the function of testifying about or certifying as true the facts underpinning an application for an arrest warrant.

Finally, the Fourth Circuit shed further light on the range of prosecutorial functions covered by absolute immunity in *Carter*. Two types of misconduct were at issue. First, the prosecutor allegedly failed to turn over exculpatory evidence. The Fourth Circuit affirmed the district court's determination that absolute immunity applied, reasoning that "[t]he decision whether to turn [the exculpatory] evidence over to defense counsel would have occurred after [the defendant's] arrest, but before his conviction, and is clearly part of the presentation of the State's case." *Carter*, 34 F.3d at 263. Second, the prosecutor was accused of conspiring to present false testimony by coaching a witness as to how to answer a question. *Id.* at 261. Citing *Imbler*, the Fourth Circuit stated definitively "that the presentation of false testimony in court is a charge for which

the prosecutor is afforded absolute immunity." *Id.* at 263. Thus, the Fourth Circuit affirmed the district court's grant of absolute immunity for conspiring to present false testimony. *Id.*

Turning to the case at hand, the first two allegations—(1) providing Carey access to Willis's interview and (2) orchestrating a sham interview with Carey and Todd to solicit fabricated statements from them—plainly fall within the range of conduct afforded absolute immunity. Each of these alleged acts occurred after Willis's arrest and arraignment; thus, the judicial process was clearly in motion. Furthermore, *Buckley* established that advocacy includes evaluating evidence and interviewing witnesses in preparation for trial. 509 U.S. at 273. Similarly, *Carter* noted that coaching a witness how to answer questions is an advocative act. 34 F.3d at 261. Since acts of advocacy include those undertaken by a prosecutor in preparation for the initiation of judicial proceedings as well as for trial, *Buckley*, 509 U.S. at 273, a prosecutor interviewing or coaching a witness in preparation for a preliminary hearing is within the sweep of absolute immunity.

In providing Carey access to the transcript and conducting follow-up interviews with Carey and Todd on March 30, 2011, O'Shea was preparing for the preliminary hearing on May 4, 2011. Moreover, Willis's assertion that Carey "dramatically modified her story and embellished her written statement with more inherently incredible claims as she 'remembered' and described additional fabricated events," (Compl. ¶ 72), does not implicate O'Shea in the actual fabrication of her statements—unlike the prosecutors in *Kalina* and *Buckley* who allegedly manufactured evidence themselves. Refreshing a

14

witness's recollection of events is a critical element of trial preparation. Accordingly, absolute immunity precludes liability for the first two allegations.

Liability for the third allegation—that at some point between March 30, 2011 and May 4, 2011, O'Shea and Lt. Blevins agreed to characterize Carey's admittedly self-inflicted injuries as ligature marks—falls in a grey area requiring more factual context. Therefore, the Court will reserve judgment on the applicability of absolute immunity to this allegation until summary judgment. Willis asserts that under O'Shea's supervision, Lt. Blevins "repeatedly clarified with Carey that her wounds were all self-inflicted but appeared to be 'ligature marks.'" (Compl. ¶ 73.) As with the first two allegations, this conduct would seem to constitute witness preparation. However, Willis makes the additional claim that at the preliminary hearing, "O'Shea solicited false testimony from Lt. Blevins that Carey's injuries were, in fact, ligature marks inflicted by Willis." (*Id.*) Read together in the light most favorable to the plaintiff, these alleged facts arguably state a claim for relief that is not precluded by absolute immunity. If, in fact, O'Shea conspired with Lt. Blevins to misrepresent Carey's statements at the preliminary hearing, *Buckley* and *Kalina* would suggest that absolute immunity does not extend to such deceitful conduct. If, on the other hand, O'Shea knowingly allowed Lt. Blevins to testify falsely, absolute immunity would protect this conduct pursuant to *Imbler* and *Carter*.

The allegation that O'Shea and Lt. Blevins conspired to fabricate evidence is the most troubling claim against O'Shea. Willis's Complaint contains minimal "facts" in support of the allegation, but, if proven, the charge of fabricating crime scene photographs is disturbing. *Buckley* and *Kalina* make clear that the manufacturing of

15

evidence by a prosecutor, unlike the presentation of false evidence, is at best only protected by qualified immunity. *Buckley* addressed fabrication in the context of a preliminary investigation, but there is no reason to believe that post-arrest fabrication is entitled to any greater protection, as this conduct is still investigatory in nature. Moreover, *Kalina* distinguished the presentation of false evidence from the manufacturing of evidence. While the presentation of false evidence cannot "affect the truth or falsity of" the evidence offered, *Kalina*, 522 U.S. at 130, the fabrication of evidence necessarily makes it untruthful. This distinction is subtle, but significant. Thus, assuming that the fourth allegation is based in fact, the claimed misconduct is not protected by absolute immunity.

The final set of allegations claim that O'Shea conspired to present fabricated evidence at Willis's bond hearings, pretrial detention hearing, and trial. *Imbler* and *Carter* provide "that the presentation of false testimony in court is a charge for which the prosecutor is afforded absolute immunity." *Carter*, 34 F.3d at 261 (citing *Imbler*, 424 U.S. at 416, 431). Therefore, absolute immunity bars further prosecution of any claim premised on the presentation of fabricated evidence to the Court.

### B. Failure to Allege Facts Sufficient to State a Claim and Qualified Immunity

The only allegations not protected by absolute immunity are the fabrication of testimony and photographic evidence. O'Shea makes two overlapping arguments for dismissal of these elements of Willis's claim. First, he asserts that Willis has failed to allege sufficient facts to show the existence of a conspiracy to violate Willis's constitutional rights. (Defs.' Mem. Supp. Mot. Dismiss 6–7, ECF No. 11.) Second,

O'Shea claims to enjoy qualified immunity for this purported misconduct because Willis has alleged insufficient facts to establish a causal link between the fabrication of evidence and the deprivation of liberty. (Def.'s Reply Pl.'s Opp. Mot. Dismiss 3, ECF No. 18.)

The Complaint is long on conclusions but short on supporting facts. However, the Complaint need not assert "detailed factual allegations," though the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). And again, the Court must accept Willis's well-pleaded allegations as true and view the Complaint in the light most favorable to him. *T.G. Slater*, 385 F.3d at 841. With that guidance in mind, and erring on the side of caution, the Court finds that Willis has alleged facts sufficient to state a claim for conspiracy to fabricate evidence and to defeat the assertion of qualified immunity.

"To establish a civil conspiracy claim under § 1983 [or § 1985], [the plaintiff] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Even if these elements are satisfied, "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Washington v. Wilmore*, 407 F.3d 274, 281 (4th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether qualified immunity applies entails a two-step inquiry: (1) "whether a constitutional right would have been violated on the facts alleged;" and (2) "whether the

right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Only an affirmative finding on both questions precludes the application of qualified immunity.

When fabrication of evidence forms the basis of the § 1985 claim, the fabrication alone is insufficient to establish a violation. Rather, the plaintiff must show "that [the official] fabricated evidence and that the fabrication resulted in a deprivation of [the plaintiff's] liberty." *Wilmore*, 407 F.3d at 282. The deprivation of liberty must also have been "a reasonably foreseeable result of [the] initial act of fabrication." *Id.* at 283.

Willis's Complaint asserts a claim against O'Shea and Lt. Blevins for conspiracy to fabricate evidence (Compl. ¶ 117), but fails to allege any specific details about the formation of the conspiracy.[5] Willis does recount several alleged overt acts purportedly in furtherance of the conspiracy, namely that they: (1) orchestrated a sham interview to solicit fabricated statements from Carey and Todd on March 30, 2011; (2) agreed to characterize Carey's admittedly self-inflicted injuries as ligature marks; (3) fabricated photographs of the alleged crime scene; and (4) used the fabricated evidence to mislead the Court during the pretrial hearings and trial. (Compl. ¶¶ 118.A.–F.) The Complaint contains additional supporting factual allegations. Paragraph 72 adds:

> On March 30, 2011, . . . O'Shea and Lt. Blevins continued their sham investigation of the events of March 8, 2011, through a[n] . . . interview with Carey and Todd []. During the . . . interview orchestrated by O'Shea and Lt. Blevins, Carey dramatically modified her story and embellished her

---

[5] Willis contends that "[i]n over twenty paragraphs and subparagraphs in the complaint, [he has] identifie[d] specific acts committed jointly and in concert by Mr. O'Shea and Lt. Blevins during the pre-indictment sham investigation . . . ." (Pl.'s Mem. Opp. Mot. Dismiss 6 (citing Compl. ¶¶ 56 – 69, 72–73, 118.A.–F.).) However, the vast majority of these paragraphs describe actions taken by Lt. Blevins without any reference to O'Shea. Only paragraphs 72–73 and 118.A.–F. implicate O'Shea in any way.

written statement with more inherently incredible claims as she "remembered" and described additional fabricated events that did not occur the evening of March 8, 2011. O'Shea and Lt. Blevins later used the fabricated events that Carey described in the . . . interview to bootstrap support for the false charges against Willis at his Preliminary Hearing on May 4, 2011.

(Compl. ¶ 72.) The Complaint further states:

During the . . . interview, O'Shea and Lt. Blevins also discussed at length Carey's self-inflicted wounds with Carey. Under O'Shea's supervision, Lt. Blevins repeatedly clarified with Carey that her wounds were all self-inflicted but appeared to be "ligature marks." Carey repeatedly acknowledged that her wounds were self-inflicted, and Lt. Blevins stated again that they could appear to be ligature marks but that he was fully aware that they were self-inflicted wounds. O'Shea and Lt. Blevins used their belief that the self-inflicted injuries could appear to be ligature marks to mislead the Court at Willis's preliminary hearing on May 4, 2011, during which O'Shea solicited false testimony from Lt. Blevins that Carey's injuries were, in fact, ligature marks inflicted by Willis.

(Compl. ¶ 73.)

Although the Complaint is lacking in factual detail and presents a barebones claim, the facts alleged and the inferences from them are sufficient to survive Rule 12(b)(6) scrutiny. When read with the claims in paragraphs 118.A.–F. and in the light most favorable to Willis, the supporting allegations in paragraphs 72 and 73 give rise to a plausible inference that O'Shea and Lt. Blevins either explicitly or implicitly agreed to fabricate evidence. Thus, the requirement that they act "jointly in concert" is satisfied. *Hinkle*, 81 F.3d at 421. As well, Willis has alleged several overt acts in furtherance of the conspiracy by Lt. Blevins and O'Shea. For example, O'Shea and Lt. Blevins allegedly "agreed to characterize Carey's self-inflicted injuries as 'ligature marks'" and intentionally misled the Court at Willis's preliminary hearing on May 4, 2011, when

19

"O'Shea solicited false testimony from Lt. Blevins that Carey's injuries were, in fact, ligature marks inflicted by Willis." (Compl. ¶¶ 73, 118.B.) Finally, Willis's arrest and pretrial detention constitute a deprivation of liberty. Thus, Willis has made sufficient factual allegations to state a claim for relief.

Furthermore, Willis has alleged sufficient facts to preclude a finding of qualified immunity at this time. Examining each allegation of misconduct and the corresponding deprivation of liberty that resulted,[6] O'Shea argues that Willis has pled insufficient facts to "establish a causal connection between the alleged conspiracy and any period which Mr. Willis spent deprived of liberty," as required by *Wilmore*. (Def.'s Reply to Pl.'s Opp. Mot. Dismiss 5.) Accordingly, O'Shea concludes, there can be no constitutional violation, and thus, he is entitled to qualified immunity. The Court's previous observations about the skeletal assertions in the Complaint apply with equal force here. However, the Court finds the allegations to be sufficient to survive the Motion to Dismiss.

Rather than examine each element of the "incarceration timeline," the Court's analysis will focus on the May 4, 2011 preliminary hearing as an illustration of the sufficiency of the Complaint.[7] With respect to the preliminary hearing, O'Shea argues:

---

[6] O'Shea constructs an "incarceration timeline" for Willis from the allegations in the Complaint. The timeline begins with his arrest March 15, 2011, and ends with his acquittal on May 8, 2012. With each event—the arrest, the bond hearings, the preliminary hearing, and the trial, among others—O'Shea repeats the relevant factual allegations made in the Complaint and then argues that each set of allegations is insufficient to show causation for that period of incarceration.

[7] If it can be shown that any period of incarceration was caused by the fabrication of evidence, the Complaint has stated a claim for relief. Accordingly, the Court need only consider one event on the timeline, if the requisite causal link is established between the fabrication of

> The only substance, such as it is, to the causation element of Mr. Willis's conspiracy claim relates to the Preliminary Hearing. Mr. O'Shea allegedly elicited testimony from Lt. Blevins that the marks on Carey's arms were ligature marks, not self-inflicted. Given Carey's testimony at the Preliminary Hearing, Lt. Blevin's characterization of the marks as "ligature marks" would have been a sideshow to the probable cause determination.

(Def.'s Reply to Pl.'s Opp. Mot. Dismiss 5.) The Westmoreland County General District Court may well have found probable cause to certify the charges based solely on the testimony of Carey. However, this Court's analysis is confined to the four corners of the Complaint, which specifies that the probable cause determination was based on the testimony of both Carey and Lt. Blevins. (Compl. ¶ 80.) Certainly, the combination of the fabricated photographs and the testimony by Lt. Blevins, as charged by Willis, could have formed the basis of the Court's probable cause determination. A favorable reading of the allegations in the Complaint could plausibly support such a finding. As a result of the certification of the charges, Willis's incarceration continued. Accordingly, the Complaint contains sufficient allegations to demonstrate a causal link between the alleged conspiracy and the deprivation of liberty, thus establishing a constitutional violation. Moreover, based on the discussion of *Buckley* and *Kalina* above, the right not to be deprived of one's liberty by the fabrication of evidence is clearly established. Thus, the current record precludes a finding of qualified immunity for O'Shea's alleged involvement in the conspiracy to manufacture evidence against Willis.

---

evidence and the period of incarceration associated with the specific event at which the evidence was used.

## IV. CONCLUSION

Based on the foregoing analysis, the Motion to Dismiss will be granted in part and denied in part with respect to Defendant O'Shea. Absolute immunity bars prosecution of a § 1985 claim premised on the following allegations: (1) providing Carey access to Willis's voluntary, recorded interview about the events that occurred on March 8, 2011; (2) orchestrating a sham interview with Carey and Todd, on March 30, 2011; and (3) using the fabricated evidence to mislead the Court during the pretrial hearings and trial. (*See* ¶¶ 118.A., 118.D.–F.) Thus, the Motion to Dismiss will be granted with respect to these elements of Willis's claim.

On the other hand, neither absolute immunity nor qualified immunity affords protection for the remaining allegations—that O'Shea and Lt. Blevins agreed to re-characterize Carey's admittedly self-inflicted injuries as ligature marks and conspired to fabricate the photographs of the crime scene—if they are grounded in fact. And, although the factual contentions supporting the remaining allegations are fairly sparse, these allegations are sufficient to survive Rule 12(b)(6) review. Therefore, the Motion to Dismiss will be denied with respect to these remaining elements of Willis's claim.

As stated above, Willis does not oppose Defendant Franklin's Motion to Dismiss. Accordingly, the Motion to Dismiss will be granted with respect to Franklin.

An appropriate Order will accompany this Memorandum Opinion.

_/s/_

Henry E. Hudson
United States District Judge

Date: July 30, 2013
Richmond, VA

22